# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| (1) DEBORAH DEPUY, Derivatively on Behalf of Herself and All Others Similarly Situated, | No. CIV-13-69-M |
| Plaintiff, | |
| vs. | VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT |
| (1) TOM L. WARD;<br>(2) JIM J. BREWER;<br>(3) EVERETT R. DOBSON;<br>(4) WILLIAM A. GILLILAND;<br>(5) DANIEL W. JORDAN;<br>(6) ROY T. OLIVER, JR.; and<br>(7) JEFFREY S. SEROTA; | DEMAND FOR JURY TRIAL |
| Defendants, | |
| -and- | |
| (8) SANDRIDGE ENERGY, INC., | |
| Nominal Defendant. | |

## INTRODUCTION

1.      Plaintiff, by and through her attorneys, brings this action derivatively on behalf of nominal defendant SandRidge Energy, Inc.  ("SandRidge" or the "Company") and alleges upon personal knowledge as to herself and her own acts, and as to all other matters based upon the investigation conducted by her attorneys, which included, among other things, a review of Securities and Exchange Commission ("SEC") filings, documents, analyst reports, news reports, press releases, and other publicly-available information regarding the Company, as follows:

2.      This is a shareholder derivative action brought on behalf of the Company against the members of its Board of Directors ("Board") and/or certain of its executive officers seeking to remedy defendants' breaches of fiduciary duties and other violations of the law that occurred from at least June 2008 through the present ("Relevant Period").

3.      SandRidge, with its headquarters in Oklahoma City, operates as an independent natural gas and oil company in the United States.  The Company engages in the exploration, development, and production of oil and gas properties.  The Chairman and Chief Executive Officer ("CEO") of SandRidge – defendant Tom L. Ward ("Ward") – founded SandRidge in June 2006, when he purchased a substantial interest in the Company's predecessor and became the CEO and Chairman.  Previously, Ward co-founded Chesapeake Energy.

4.      Members of the Company's Board breached their fiduciary duties to the Company.  Specifically, members of SandRidge's Board: (1) were dominated and

1

controlled by CEO Ward and acted in the best interests of Ward rather than the interests of the Company; (2) caused the Company to make major strategic missteps; (3) engaged in reckless spending that was not in the best interests of the Company; (4) engaged in corporate waste through the approval of excessive compensation for its executives; and (5) approved transactions that were for the primary benefit of members of the Company's Board and not in the best interests of the Company.  Members of the Company's Board also caused the Company to make false and misleading financial statements.  Thus, members of the Company's Board breached their fiduciary duties to the Company and have subjected the Company to substantial losses, adverse publicity, additional costs and potential fines, and other occurrences harmful to the Company.

## JURISDICTION AND VENUE

5.     This Court has jurisdiction over this action under 28 U.S.C. §1331 (federal question jurisdiction) insofar as the claims herein arise under Section 14(a) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78n(a)] and Rule 14a-9 thereunder [17 C.F.R. § 240.14a-9].  The Court also has jurisdiction under 28 U.S.C. §1367 as to the state law claims pled herein, insofar as they arise out of the same transactions and occurrences as the federal claims.

6.     Venue is proper in the Western District of Oklahoma pursuant to 28 U.S.C.§ 1391(a) in that many of the violations alleged herein, including the dissemination of false and misleading proxy statements, occurred in this District.

7.     To the extent that this action is brought derivatively, and is subject to Rule 23 of Federal Rules of Civil Procedure, it is averred that this action is not brought collusively to confer jurisdiction on a court of the United States it otherwise would not have.

**PARTIES**

8.     Plaintiff Deborah Depuy is a current shareholder of the Company and has been a shareholder of the Company during the Relevant Period.

9.     Nominal Defendant SandRidge is incorporated in the State of Delaware and maintains its principal place of business at 123 Robert S. Kerr Avenue, Oklahoma City, Oklahoma.

10.     Defendant Tom L. Ward ("Ward") is, and at all relevant times was, Chairman, CEO, and a director of the Company.  Ward has served as the SandRidge's Chairman and CEO since June 2006 and has served as the Company's President from December 2006 to January 2011.

11.     Defendant Jim J. Brewer ("Brewer") is, and at all relevant times was, a director of the Company.  Brewer was appointed as a director of the Company on February 28, 2011.

12.     Defendant Everett R. Dobson ("Dobson") is, and at all relevant times was, a director of the Company.  Dobson was appointed as a director of the Company on September 24, 2009.

13.     Defendant William A. Gilliland ("Gilliland") is, and at all relevant times was, a director of the Company.  Gilliland was appointed as a director of the Company on January 7, 2006.

14.     Defendant Daniel W. Jordan ("Jordan") is, and at all relevant times was, a director of the Company.   Jordan was appointed as a director of the Company in December 2005.

15.     Defendant Roy T. Oliver, Jr. ("Oliver") is, and at all relevant times was, a director of the Company.  Oliver was appointed as a director on July 13, 2006.

16.     Defendant Jeffrey S. Serota ("Serota") is, and at all relevant times was, a director of the Company.  Serota was appointed as a director of the Company on March 20, 2007.

17.     Defendants Ward, Brewer, Dobson, Gilliland, Jordan, Oliver, and Serota are collectively referred to herein as the "Individual Defendants."

## DUTIES OF THE INDIVIDUAL DEFENDANTS

18.     By reason of their positions as officers and/or directors of the Company, and because of their ability to control the business and corporate affairs of the Company, the Individual Defendants owed the Company and its shareholders the fiduciary obligations of good faith, trust, loyalty, and due care, and were, and are, required to use their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner.   The Individual Defendants were, and are, required to act in

furtherance of the best interests of the Company and its shareholders to benefit all shareholders equally and not in furtherance of their personal interests or benefit.

19.    Each director and officer owed to the Company and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.  In addition, as officers and/or directors of a publicly held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information concerning the Company's revenue, margins, operations, performance, management, projections, and forecasts, so that the market price of the Company's stock would be based on truthful and accurate information.

20.    The Individual Defendants, because of their positions of control and authority as directors and/or officers, were able to, and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company.  Because of their executive, managerial, and/or directorial positions within the Company, each of the Individual Defendants had access to adverse, non-public information about the Company's financial condition and operations, and the misrepresentations made relevant thereto.

21.    At all times relevant hereto, each of the Individual Defendants was the agent of the other Individual Defendants and of the Company, and was at all times acting within the course and scope of such agency.

22.     To discharge their duties, the Individual Defendants were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company.  By virtue of such duties, the Individual Defendants were required to, among other things:

a.     manage, conduct, supervise and direct the business affairs of the Company in accordance with all applicable laws;

b.     neither violate, nor knowingly permit any officer, director or employee of the Company to violate, applicable laws, rules and regulations;

c.     establish and maintain systematic and accurate records and reports of the business and affairs of the Company and procedures for the reporting of the business and affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

d.     neither engage in self-dealing, nor knowingly permit any officer, director or employee of the Company to engage in self-dealing;

e.     ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

f.     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

g.      properly and accurately guide investors and analysts regarding the true financial condition of the Company at any given time, including making accurate statements about the Company's financial results and prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times; and

h.      remain informed regarding how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices and make such disclosures as necessary to comply with applicable laws.

23.     Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and its shareholders the fiduciary duties of loyalty, good faith, the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of the Individual Defendants alleged herein involves a violation of their obligations as directors and/or officers of the Company, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware, or should have been aware, posed a risk of serious injury to the Company.  The conduct of the Individual Defendants, who were also officers and/or directors of the Company, has been ratified by the remaining defendants.

24.     The Individual Defendants breached their duties of loyalty and good faith by allowing defendants to cause, or by themselves causing, the Company to misrepresent its financial results and prospects, as detailed herein, and by failing to prevent employees and/or officers of the Company from taking such illegal actions.   In addition, the Company is now the subject of class action litigation alleging violation of federal securities laws, which necessitates the Company to incur excess costs arising from the Individual Defendants' wrongful course of conduct.

25.     Additionally, the Company has established a Code of Business Conduct and Ethics ("Business Code") that applies to all employees of the Company.  The conduct of the Individual Defendants alleged herein constitutes a violation of the Company's Business Code.  The Business Code provides, among other things, the following:

> This Code of Business Conduct and Ethics (the "Code") is a statement of SandRidge Energy, Inc.'s and its subsidiaries' (collectively, "SandRidge" or the "Company") expectation of conduct in legal and ethical matters and applies to every director, officer, and employee of SandRidge.  SandRidge is committed to high standards of ethical conduct. Directors, officers and employees of the Company are expected to comply with all applicable rules, regulations and laws and to act with honesty and integrity when conducting the Company's business. Although this Code cannot and is not intended to cover every applicable law or provide answers to all questions that might arise in the performance of your duties, it should serve as a reference in fulfilling your responsibility to conduct business in an ethical and legal manner. Any waiver of any provision of this Code for executive officers or directors may be made only by the Board of Directors and must be promptly disclosed to shareholders in accordance with New York Stock Exchange listing requirements.
>
> All officers, directors and employees are expected to acquire and maintain a working knowledge of applicable laws and the Company's ethical standards. In addition, every supervisor and manager is responsible for helping employees understand and comply with this Code. Persons who

8

violate this Code or the spirit of this Code may be subject to disciplinary action, up to and including termination or removal and, if applicable, referral to the appropriate authorities for prosecution. If you have any questions about the application of this Code or about what is required by the law in a particular situation, you should consult with the Sr. Vice President of Human Resources or the Legal Department, General Counsel.

This Code is not intended to and does not in any way constitute an employment contract or assurance of continued employment, and does not create any rights for any director, officer, employee, consultant, vendor, business partner, shareholder or any other person or entity.

**Policy Statement**

This Code applies to every officer, director and employee of SandRidge. The term employee includes any individual that is performing work for which they are compensated on the payroll of SandRidge or any of its subsidiaries.

This Code is designed to deter wrongdoing by the Company's directors, officers and employees and to promote the following:

- Honest and ethical conduct;
- Avoidance of conflicts of interest;
-  Full, fair, accurate, timely and understandable disclosure in reports and documents that the Company files with, or submits to, the U.S. Securities and Exchange Commission and in other public communications made by the Company;
- Compliance with applicable governmental laws, rules and regulations;
- Prompt internal reporting to a person identified in this Code of possible violations of this Code; and
- Accountability for adherence to this Code.

**Conflicts of Interest**

A conflict of interest occurs when an officer, director or employee's private interest interferes in any way – or appears to interfere – with the interests of the Company. Conflicts of interest include, but are not limited to, the following:

- Ownership in an enterprise that does business with, seeks to do business with, or is a competitor of the Company;

9

- •   Receipt of gifts or entertainment in excess of a nominal value (see separate Vendor Gift Policy and Gift Reporting Form);
- •   Participation in any outside activity that competes with the Company or that interferes with the performance of an employee, officer or director's duties to the Company.

No officer, director or employee shall hold a position of material interest in an entity that conflicts with or appears to conflict with, proper performance of Company duties and responsibilities or the ability to make independent judgments regarding transactions between SandRidge and the entity. Employees, officers and directors may not use their positions, Company assets, or confidential information gained in connection with their employment or involvement with the Company for personal gain or for the benefit of a family member or any outside party. All potential conflicts of interest must be disclosed in writing to the Senior Vice President of Human Resources. Determination will be made in consultation with the General Counsel whether such conflict or potential conflict is incompatible with the officer, director or employee's duties.

## Corporate Opportunities

SandRidge officers, directors and employees are prohibited from (a) personally taking advantage of investment opportunities that are discovered through the use of Company property, information or position; (b) using Company property, information or position for personal gain; and (c) competing with the Company. Officers, directors and employees owe a duty to the Company to advance its legitimate interests when the opportunity to do so arises.

## Confidentiality

Officers, directors and employees should maintain the confidentiality of all information entrusted to them by the Company, its suppliers, owners or customers, except when disclosure is authorized or legally mandated. Confidential information includes all non-public information that might be of use to competitors or harmful to the Company or its customers, if disclosed. Confidential information should not be shared with the media, competitors or any other third parties.

**Fair dealing**

All officers, directors and employees shall deal fairly, honestly and ethically with the Company's working interest owners, royalty owners, lessors, customers, contractors, competitors, suppliers, regulators, business partners, shareholders, employees and others. No officer, director or employee shall take unfair advantage of anyone through manipulation, concealment, abuse of privileged or confidential information, misrepresentation, fraudulent behavior or any other unfair dealing practice.

Fraudulent behavior includes, but is not limited to:

- Forgery or alteration of Company documents, including negotiable instruments;
- Misappropriation of Company, customer, partner or supplier assets;
- Unauthorized handling or reporting of Company transactions; and/or
- Falsification of Company records or financial statements.

**Protection and Proper Use of Company Assets**

All Company assets should be used for legitimate purposes and protected against theft, waste or loss. Company assets include, but are not limited to, cash, land, buildings, equipment, inventory, vehicles, appliances (i.e. telephones, computers, copiers, etc.) and intangible items such as business plans, prospects and Company records, name, logo and tag line.

**Compliance with Laws, Rules and Regulations (including Insider Trading)**

SandRidge officers, directors and employees are expected to obey all federal, state and local laws. All Company business should be conducted in full compliance with applicable law. Questions about the law or its application should be directed to the Company's General Counsel.

Officers, directors and employees may have "inside information" about matters such as significant projects, major litigation, potential sales or acquisitions, or financial results or forecasts. This information must remain strictly confidential until released to the public and is never to be used for personal gain or advantage. In particular, use of confidential information in dealing with Company securities (or other securities likely to be affected by

11

such information) may violate state and federal securities laws, including rules adopted by the U.S. Securities and Exchange Commission. Civil and criminal penalties could result for anyone who uses or shares inside information.

26.     The Company has also established a Financial Code of Ethics ("Financial Code") that applies to the Company's senior officers.   The conduct of the Individual Defendants alleged herein constitutes a violation of the Company's Financial Code.   The Financial Code provides, among other things, the following:

> This Financial Code of Ethics (this "Financial Code") of SandRidge Energy, Inc. (the "Company") contains the ethical principles by which the Chief Executive Officer, Chief Financial Officer (or other principal financial officer), Controller (or other principal accounting officer) and other senior financial officers (collectively the "Senior Officers") are expected to conduct themselves when carrying out their duties and responsibilities. Senior Officers must also comply with the Company's Corporate Code of Business Conduct and Ethics.

> **I.     Ethical Principles**

> In carrying out his or her duties to and responsibilities for the Company, each Senior Officer should:

> •     Act ethically with honesty and integrity, including the ethical handling of actual or apparent conflicts of interest between personal and professional relationships;
> •     Provide full, fair, accurate, timely and understandable disclosure in reports and documents that the Company files with, or submits to, the United States Securities and Exchange Commission ("SEC") and in other public communications that the Company makes;
> •     Comply with applicable laws, rules and regulations of national, state, provincial and local governments and private and public regulatory agencies having jurisdiction over the Company;
> •     Act in good faith, responsibly, with due care, competence and diligence, without misrepresenting material facts or allowing

12

his or her independent judgment on behalf of the Company to be subordinated to other interests;

- Promote honest and ethical behavior by others in the work environment;
- Respect the confidentiality of information acquired in the course of his or her work except when authorized or otherwise legally obligated to disclose such information. Such confidential information must not be used for the personal advantage of any Senior Officer or parties related to such Senior Officer;
- Responsibly use and maintain all assets and resources employed or entrusted to such Senior Officer;
- Promptly report violations of this Financial Code to the Chairman of the Audit Committee of the Board of Directors ("Audit Committee"); and
- Accept accountability for adherence to this Financial Code.

## II.      Waivers

Consents obtained pursuant to this Financial Code, or waivers of any provision of this Financial Code, shall be made only by the Company's Board of Directors. Persons seeking a waiver should be prepared to disclose all pertinent facts and circumstances, respond to inquiries for additional information, explain why the waiver is necessary, appropriate, or in the best interest of the Company, and be willing to comply with any procedures that may be required to protect the Company in connection with a waiver. If a waiver of this Financial Code is granted for any Senior Officer, appropriate disclosure will be made promptly in accordance with the rules and regulations of the SEC.

## III.     Compliance Procedures

Enforcement of sound ethical standards is the responsibility of every officer and employee of the Company. Violations and reasonable suspicions of violations of this Financial Code should be reported promptly to the Chairman of the Audit Committee. The reporting person should make full disclosure of all pertinent facts and circumstances, taking care to distinguish between matters that are certain and matters that are suspicions, worries or speculation, and also taking care to avoid premature conclusions or alarmist statements since the situation may involve circumstances unknown to the reporting person. If the situation so requires, the reporting person may report anonymously. The Company does not permit retaliation

of any kind for good faith reports of ethical violations. Persons that knowingly make a report that is false or that willfully disregard its truth or accuracy, or engage in any other bad faith use of the reporting system, will be deemed to be in violation of the Company's Corporate Code of Business

Conduct and Ethics.

Each director and Senior Officer of the Company shall be provided with a copy of this Financial Code. This Financial Code may also be provided to any other employee as any Senior Officer deems appropriate. Each Senior Officer shall sign a written affirmation acknowledging that the Senior Officer has received, read and understood this Financial Code. The affirmation may be separate from or included within another affirmation or acknowledgment relating to codes of conduct and ethics, employee manuals, handbooks or other materials supplied to Senior Officers. Any Senior Officer, director, executive officer or employee to whom this Financial Code has been provided may be required, from time to time, to sign a written affirmation stating that the person (1) has received and read this Financial Code and understands its contents, (2) has not violated this Financial Code and (3) has no knowledge of any violation of this Financial Code that has not been communicated previously to the Chairman of the Audit Committee.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

27.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with, and conspired with, one another in furtherance of their common plan or design.   In addition to the wrongful conduct herein alleged as giving rise to primary liability, the Individual Defendants further aided and abetted and/or assisted each other in breach of their respective duties.

28.     During all times relevant hereto, the Individual Defendants collectively and individually initiated a course of conduct that was designed to and did:

14

(a)     Conceal the fact that the Company was improperly misrepresenting its financial results in order to allow defendants to artificially inflate the price of the Company's shares;

(b)     Maintain the Individual Defendants' executive and directorial positions at the Company and the profits, power, and prestige that the Individual Defendants enjoyed as a result of these positions; and

(c)     Deceive the investing public, including shareholders of the Company, regarding the Individual Defendants' management of the Company's operations, the Company's financial health and stability, and future business prospects, specifically related to the Company's financial condition that had been misrepresented by the Individual Defendants throughout the Relevant Period.

29.     In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein.

30.     The Individual Defendants engaged in a conspiracy, common enterprise, and/or common course of conduct during the Relevant Period.  During this time, the Individual Defendants caused the Company to conceal material facts, misrepresent its financial results, and violate applicable laws.  In addition, the Individual Defendants also made other specific, false statements about the Company's financial performance and future business prospects, as alleged herein.

31.     The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things: (1) to disguise the Individual Defendants' breaches of fiduciary duty, abuse of control, gross mismanagement, waste of corporate assets, and unjust enrichment; (2) to conceal adverse information concerning the Company's operations, financial condition, and future business prospects; and (3) to artificially inflate the price of the Company's stock so that

the Individual Defendants could protect and enhance their executive and directorial positions and the substantial compensation and prestige they obtained as a result thereof.

32.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company to purposefully, recklessly or negligently misrepresent its financial results.  Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary and substantial participant in the conspiracy, common enterprise, and/or common course of conduct alleged herein.

33.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs alleged herein.  In taking such actions to substantially assist the commission of the wrongdoing alleged herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his or her overall contribution to, and furtherance of, the wrongdoing.

## SUBTANTIVE ALLEGATIONS

34.     SandRidge is an oil and natural gas exploration company that focuses on drilling low-risk, conventional, high rate-of-return oil wells in shallow carbonate reservoirs.  SandRidge is a developer of the Mississippian Oil Play, with assets in the Permian Basin and Gulf of Mexico.

35.     In 2006, CEO Ward formed SandRidge when he bought a controlling interest in Riata Energy.  Ward, the former co-founder and COO of Chesapeake Energy

Corp., then changed the name of the Company to SandRidge.  SandRidge is traded on the New York Stock Exchange under the ticker symbol "SD."

36.     CEO Ward purportedly decided to transition the Company from a natural gas company to an onshore oil company in 2008.  To make this transition, the Company needed to raise funds to acquire a base of oil assets, licenses, and properties. Accordingly, the Company raised funds to explore and develop prospects in an area known as the West Texas Overthrust.  In the second quarter of 2008, the Company operated 47 running rigs for oil discovery and recovery.  SandRidge's stock price climbed dramatically to approximately $70.

37.     By the first quarter 2009, however, SandRidge's gains evaporated as the Company's stock plummeted to approximately $5.00 per share when the Company reported a net loss to shareholders of $1.2 billion. Additionally, during the first quarter, 2009, SandRidge recorded a pretax, noncash impairment charge of $1.86 billion against the carrying value of the Company's gas and oil properties for the last quarter 2008. Accordingly, SandRidge effectively wrote off the assets that the Company purchased, thereby destroying huge amounts of shareholder capital.

38.     The Individual Defendants' disastrous business decisions continued.  For example, in the second quarter of 2010, the Company carried debt equivalent to ***104%*** of its market capital.  Indeed, in one week alone in early August 2011, SandRidge's stock price plummeted 42% because of the Company's reckless spending.  This drop came on the Company's announcement that SandRidge was increasing its capital spending to $1.8

17

million – approximately $500 million higher than the Individual Defendants previously represented to investors.  As one analyst stated on August 5, 2011: "this is unsettling for the market which wants to see cash used to ramp up production and effectively deleverage the company. Continued spending on land does the exact opposite of that."

39.     In February 2012, moreover, SandRidge announced that the Company was acquiring Dynamic Offshore Resources – a company focused on offshore drilling – for $680 million in cash and 74 million shares of stock valued at $8.02 a share.  Thus, within a few years, the Individual Defendants again shifted strategy, choosing to change the Company's focus from onshore business to offshore business.   On this news, SandRidge's stock price dropped another 10%.  The stock price of the Company has dropped a staggering 91% from its peak on June 16, 2008.  Indeed, TPG-Axon Capital Management LP ("TPG") – which has owned a significant percentage of the Company's stock – wrote several letters criticizing the Company's management.  As one TPG letter stated publicly: "Management strategy has been incoherent, unpredictable, and volatile, amplifying uncertainty regarding the future course of the company."  TPG also called the Company "an insatiable spender" that worries about financing needs later.

40.     These spending habits and missteps have significantly harmed the Company.   Indeed, in May 2012, a securities arbitration law firm announced an investigation of claims on behalf of shareholders who sustained losses due to an over-concentration of SandRidge stock, while the Shareholder Foundation has launched an investigation into whether SandRidge materially misrepresented SandRidge's "business,

prospects, and operations."   To date, several actions have been brought against the Company alleging violations of securities laws or on behalf of the Company alleging breaches of fiduciary duties.

41.    The Individual Defendants have also allowed CEO Ward to engage in behavior that is driven by self-interest and not in the best interest of the Company.   For instance, the Individual Defendants have continuously approved egregious compensation for Ward.   Indeed, over the past five years, the Company has paid Ward ***$150 million*** in compensation completely unrelated to the Company's performance.   Indeed, in 2011 alone, the Board approved compensation of more than $25 million to Ward.   Remarkably, $25 million represents ***a full half of the Company's earnings for the same year***.   In 2010, Ward received $21.76 million in compensation.

42.    In fact, Ward has been one of the highest compensated CEOs in the country while at SandRidge, as well as one of the highest paid energy CEOs.   Ward's compensation, however, is not even remotely connected with the performance of the Company.   Indeed, Sand Ridge has ranked among the worst in the country for losing shareholder value as reflected in its dismal share price and return on investment over its peers.   Additionally, Ward's compensation was not comparable to any peer organizations. Indeed, among the Company's peers, ***not a single CEO received compensation even close to that of Ward in 2010***.

43.    Furthermore, Ward's compensation cannot be justified by SandRidge's performance in relation to that of its peers.   Ward was awarded over $21 million in

compensation in 2010 – the same year the Company's share price ***dropped 37%***.   In contrast, "peer" companies enjoyed healthy stock price appreciation.   For example, the CEO at Forest Oil Corp. received $4.2 million in 2010 while the stock price rose 73% that same year.   Likewise, in 2010, "peer" company Newfield Exploration Co. experienced a 50% increase in its share value and its CEO was awarded $5.2 million in compensation.   At Pioneer Natural Resources, Co., the share price in 2010 rose an impressive 81%, while the CEO was awarded $8.6 million in compensation.   Finally, the CEO of Anadarko Petroleum was awarded $24.3 million in 2010 while that company's stock experienced a 22% increase in value at the same time.   Accordingly, the Individual Defendants knew, or were grossly negligent in not knowing, that Ward's compensation was not commensurate with industry standards or in any way related to SandRidge's performance.

44.    The Individual Defendants have also permitted Ward to engage in self-dealing that runs contrary to the best interest of the Company.   For example, the Company formerly permitted Ward to participate in a "well participation program."   Such a program permits executives to purchase interest in wells being developed by the Company and, in exchange for payments towards costs of the well, the executive receives a share of revenue from the well.   In September 2008, SandRidge eliminated its well-participation program, but paid Ward ***$67.3 million in cash*** for his interests.   Ward then purchased ranchland with his $67 million payment from the well participation program and leased the properties back to SandRidge.   Accordingly, in 2008 alone, the Company

made royalty payments totaling over $850,000 to Ward for the land and paid over $1 million in revenue to a trust established by Ward for development of the land.

45.     Additionally, in every year since SandRidge began reporting to the SEC, the Company has purchased interests in leases from WCT Resources, LLC, a limited liability company managed and run by Ward's son, and formed and owned by trusts established for the benefit of Mr. Ward's children.  The Company has made numerous payments to WCT Resources.  SandRidge has given $4,500,457 to WCT Resources, for the benefit of Ward's children. Ward's son, Trent Ward, is the registered agent of WCT Resources, which has a business address at the corporate headquarters of SandRidge and maintains its primary business offices within SandRidge.

46.     The payments to Ward for land use did not cease in 2008.  In September 2010, for example, the Company bought a working interest in some of Ward's properties, paying him $1.8 million while also paying him revenue and/or royalties on his lands totaling over $500,000.  Commenting on this self-dealing, the TPG Letter states:

> What has Mr. Ward done with his wealth, including the $150 million in payments from SandRidge? He has bought massive holdings of ranchland, and then turned around and leased the land to SandRidge for future exploration. Therefore, some payments to Mr. Ward continue – they have simply changed form. Cashing out of natural gas wells in October 2008 was a spectacular trade, as was swapping into ranchland in the Midwest … unfortunately at the expense of SandRidge shareholders who suffered massive write-downs on the well interests purchased from Mr. Ward.

47.     CEO Ward also purchased an ownership interest in the Oklahoma City Thunder basketball team, and then had the Company pay the team millions of dollars per year in sponsorship and luxury suite payments.  Indeed, in October 2009, the Company

entered into a four-year agreement to license a suite at the arena where the Oklahoma City Thunder plays.  The annual license fee for 2009 was $200,000 with the provision that the fee could increase each year up to 3%.  The Company also entered into a five-year agreement to pay an average annual sponsorship fee of approximately $3,275,000 for advertising and promotional activities related to the Oklahoma City Thunder. Remarkably, the Company has also paid Ward massive amounts of money for **_use_** of Thunder tickets.  In 2010, for example, SandRidge paid Ward over $300,000 to use basketball tickets.

48.    The Company, moreover, pays almost $1 million annually to provide **_personal_** accounting services to Ward and vast amounts of money for the "perk" of multiple corporate jets. In fact, the Company has four jets – some of the largest and most expensive available – and permits unlimited use of those jets to Ward who frequently uses them for personal flights to his vacation home, Las Vegas, and the Bahamas. The Company also pays for a staff of over 15 full time employees to maintain and operate these jets.  One of TPG's letters cogently identified these very issues concerning the Board's determinations towards executive compensation:

> . . . despite the single worst stock performance of any energy company, and among the worst stock performances in the entire US market, and massive discounts applied to the company because of management…**_payments to Mr. Ward from the company have totaled approximately $150 million over the past five years_** (astonishing, given the $3 billion market capitalization of the company). In each year since the IPO, compensation to Mr. Ward has represented a sizable portion of company cash flow and earnings. Upon examining corporate governance at SandRidge, one can understand why stock performance has been remarkably poor, and the 'management discount' applied to the stock by the market is very high.

22

***Management's incentives have been to take value from shareholders, rather than grow value for shareholders***, and that is the only area in which they have done a spectacular job.

49.     In addition to the disastrous damage done to the Company's value, the Individual Defendants' actions have also resulted in SandRidge suffering severe reputational damage. As stated in the TPG Letter, "CEO Tom Ward's credibility is too damaged to continue in his role" while the Company has "developed a reputation as an insatiable spender."   The TPG letter further states: "The Board of Directors must be significantly reconfigured, with certain directors replaced by credible, independent directors, chosen after extensive consultation with large shareholders. In addition, large shareholders should be invited to join the board, if they so desire."

50.     On or about November 30, 2012, TPG sent a second letter to SandRidge's Board, reiterating its desire to run a process to restructure or sell the Company.  TPG also called for the de-staggering of the Board, a process to remove directors with or without cause, and to remove and replace the current members of the Board.

51.     On December 24, 2012, TPG delivered a third letter to the SandRidge Board highlighting the reckless spending and self-interested decisions made by defendants:

> NEW YORK--(BUSINESS WIRE) – TPG-Axon, owner of 6.7% of the outstanding shares of SandRidge Energy, Inc. (NYS: SD) (the "Company"), today sent a third letter to SandRidge's Board of Directors.
>
> In the latest letter, TPG-Axon notes that it has filed a lawsuit in Delaware Chancery Court contesting the validity of the declared Initial Consent Date noted in SandRidge's 8-K, dated December 21, 2012, relating to TPG-

Axon's proposals to amend the Company's bylaws and remove and replace members of the current Board of Directors.

TPG-Axon also stated that it plans to file consent solicitation documents with the U.S. Securities and Exchange Commission (the "SEC") today. TPG-Axon is seeking to replace SandRidge's entire Board of Directors with a slate of directors that are highly qualified, of high integrity, and driven by shareholder interest. After TPG-Axon's consent solicitation is mailed to SandRidge shareholders in early January, SandRidge shareholders of record as of December 13, 2012 will have up to 60 days to submit their written consent for TPG-Axon's proposals.

"Sadly, we are not surprised that Tom Ward and the Board of Directors have resorted to shameful tricks to try and confuse shareholders and shorten the period of time in which they have to vote," said Dinakar Singh, founder and chief executive officer of TPG-Axon Capital. "The actions Tom and the Board have taken over the past several weeks reek of desperation and clearly illustrate their complete disregard for shareholder interests and transparency. Instead of limiting shareholders' ability to have their say, the Board should be focused on exploring all strategic alternatives to maximize value."

The letter also outlines actions taken by Tom Ward which TPG-Axon believes directly violate his fiduciary responsibility to shareholders. Specifically, TPG-Axon has asked SandRidge's Board to either disclose its knowledge of, or investigate instances where, Mr. Ward and his son, Trent Ward, through WCT Resources (an investment vehicle established by Mr. Ward for the benefit of his children) acted in advance of the Company to acquire mineral rights from third parties, and then leased those rights to SandRidge just weeks and months later for a profit.

52.     On December 24, 2012, TPG also filed a complaint against the Company and members of the Board alleging breach of fiduciary duty.  The complaint is pending in the Court of Chancery of the State of Delaware.

53.     A December 24, 2012 *Bloomberg* article entitled "TPG-Axon Accuses SandRidge CEO Ward and Son of Impropriety" reported the following:

TPG-Axon Capital Management LP, owner of 6.7 percent of SandRidge Energy Inc. (SD)'s outstanding shares, requested the company's board investigate whether Chief Executive Officer Tom Ward and his son acted improperly with regard to acquiring mineral rights.

Ward and his son, Trent Ward, acquired mineral rights from third parties and then leased those rights to Oklahoma City- based SandRidge "just weeks or months later" for profit, TPG- Axon said in a letter sent to the company's board today. Greg Dewey, a spokesman for SandRidge, did not immediately respond to messages seeking comment.

"It is our understanding that Mr. Ward and his son, Trent Ward, actively compete with the company, and in addition, have also engaged in repeated transactions in which they 'front-run' the company," Dinakar Singh, chief executive officer of TPG- Axon, wrote in the letter.

SandRidge has disclosed several transactions with Ward in its annual federal filing in March, including that it bought a working interest in leases from WCT Resources LLC, which is owned by trusts that are for the benefit of the CEO's children.

TPG-Axon sued SandRidge and its directors today in Delaware Chancery Court in Wilmington, asking a judge to stop any interference by SandRidge and to extend the start of the 60-day period of consent solicitation.

TPG-Axon has previously called for a shareholder vote on replacing SandRidge's board of directors.

Ward founded SandRidge after leaving Chesapeake Energy Corp. (CHK) in 2006 and owns 5.2 percent of the company's shares, according to data compiled by Bloomberg.

    54.    Additionally, a December 26, 2012 *New York Times* article entitled "Hedge

Fund Seeks Ouster of SandRidge Energy's Board" reported the following:

A New York hedge fund filed papers with federal securities regulators on Wednesday seeking to oust the board at SandRidge Energy, the latest salvo in its continuing campaign against the struggling Oklahoma City oil and gas company.

25

The hedge fund, TPG-Axon Capital Management, which owns nearly 7 percent of SandRidge's shares, submitted so-called consent solicitation documents with the Securities and Exchange Commission, offering up its own slate of directors to replace the current board.

SandRidge has come under pressure by TPG-Axon and another large hedge fund, Mount Kellett Capital Management, which have attacked the company over what they called an onerous debt load, reckless spending and incoherent business strategy.

TPG-Axon's securities filing came two days after it sent a blistering letter to SandRidge's board, demanding that it investigate whether Tom L. Ward, SandRidge's chief executive, and his son had engaged in self-dealing and had directly competed with the company.

"It is our understanding that Mr. Ward and his son, Trent Ward, actively compete with the company, and in addition, have also engaged in repeated transactions in which they 'front-run' the company," Dinakar Singh, chief executive of TPG-Axon, wrote in the letter. "It is astonishing that the C.E.O. of a company would engage in behavior that directly competes with his shareholders' interests for his own personal benefit."

The letter accuses the Wards of acquiring mineral rights and then leasing those rights to SandRidge for a profit. In securities filings this year, SandRidge said it had bought interests in mineral rights from an entity owned by Ward family trusts.

A spokesman for SandRidge, Greg Dewey, did not return telephone calls seeking comment.

SandRidge's shares are down more than 75 percent since its 2007 initial public offering and more than 90 percent since its peak in June 2008. The stock was flat in Wednesday's session, closing at $6.26.

TPG-Axon's S.E.C. filing was made in conjunction with a lawsuit filed on Monday in the Delaware Court of Chancery. The lawsuit challenges a move by SandRidge to shorten the time that shareholders have to vote on changing the company's bylaws and replacing the board with TPG-Axon's slate.

"Sadly, we are not surprised that Tom Ward and the board of directors have resorted to shameful tricks to try and confuse shareholders and shorten the

period of time in which they have to vote," Mr. Singh said in a statement. "The actions Tom and the board have taken over the past several weeks reek of desperation and clearly illustrate their complete disregard for shareholder interests and transparency."

The solicitation by TPG-Axon will be sent in early January to SandRidge shareholders, who would then have up to 60 days to consent to the fund's proposal to elect a new board, which would include Mr. Singh.

Much of TPG-Axon's criticism has been aimed at Mr. Ward. Mr. Ward started SandRidge in 2006 after leaving Chesapeake Energy, a much larger Oklahoma oil-and-gas concern that he co-founded and has had its own share of corporate governance issues in recent years. He is a part-owner of the Oklahoma City Thunder professional basketball franchise along with Aubrey McClendon, a co-founder of Chesapeake and its chief executive.

55.    Defendants also caused the Company to make false and misleading financial statements.   For instance, on February 24, 2011, SandRidge issued the Company's financial results for the fourth quarter of 2010 and the full year of 2010.  The Company's press release stated that SandRidge's "[o]il reserves increased 140% to 252 MMBbls [million barrels] at year end 2010 from 105 MMBbls at year end 2009."  In the press release, CEO Ward touted the Company's purported successful transition from a primarily natural gas-producing company to a primarily oil-producing company and that the Company's oil reserves purportedly more than doubled from year end 2009.  On this announcement, SandRidge's stock price rose approximately 15% on usually high volume.

56.    On March 1 and March 2 2011, SandRidge announced that the Company planned to commence a private offering of $700 million of Senior Notes due 2021.  The proceeds were to be used to fund a tender offer for up to $650 million in aggregate principal amount of SandRidge's 8.625% Senior Notes due 2015 then outstanding, and

with any additional funds to be used to repay borrowings outstanding under its senior credit facility.  On March 2, 2011, the Company announced that the private placement had been so successful that they increased the size of the 2021 Senior Notes offering to $900 million.

57.     Subsequently, on March 29, 2011, SandRidge announced that the Company intended to sell a 45% stake in the Company's Mississippian formation assets through the initial public offering ("IPO") of 12.5 million common units of SandRidge Mississippian Trust I, along with another 1.875 million common units that could be purchased at the option of the underwriters.  SandRidge stated that the IPO would be priced at between $19 and $21 per common unit and that these common units had been approved for listing on the NYSE under the symbol "SDT."  According to the Company's press release issued on the same day, the "Trust [would] own royalty interest conveyed to it by SandRidge which [would] entitle the Trust to a percentage of the proceeds received by SandRidge from the production of hydrocarbons from currently producing wells and development wells to be drilled by SandRidge on approximately 42,600 net acres in the Mississippian formation in northern Oklahoma."  By April 1, 2011, the SandRidge's common stock reached a high of $13.34 per share in intraday trading based upon the Company's statements.

58.     On April 6, 2011, SandRidge announced the SandRidge Mississippian Trust I IPO had been upsized to 15 million common units priced at $21.00 per common unit and that the 15 million common units represented an approximately 54% beneficial

interest in the Trust.  SandRidge also disclosed that the underwriters had another 30 days to exercise an option to purchase an additional 2.250 million common units from the Trust to cover over-allotments.

59.     SandRidge announced that the SandRidge Mississippian Trust I IPO closed April 12, 2011.  The Company's press release stated that the IPO of 17.250 million common units, including 2.250 common units sold pursuant to the exercise of the underwriters' over-allotment option, resulted in net proceeds to the Trust, before offering expenses, of approximately $338.7 million, "which proceeds were delivered to [the Company] as partial consideration for the conveyance of the royalty interests held by the Trust."  The Company also announced that the 17.250 million common units sold to the public in the IPO represented an approximately 61.6% beneficial interest in the Trust, and that the Trust also issued to SandRidge 3.750 million common units and 7 million subordinated units convertible into common units, "together represented an approximately 38.4% beneficial interest in the Trust."

60.     On May 5, 2011, SandRidge announced the Company's financial results for the first quarter of 2011.  The Company's press release cited CEO Ward touting the success of SandRidge's efforts to monetize the purportedly oil-rich Mississippian formation assets through the SandRidge Mississippian I Trust IPO.

61.     On August 4, 2011, SandRidge announced that the Company had further monetized its Mississippian formation assets by raising an additional $500 million through a joint development venture with Atinum Partners, Co. Ltd.  In the Company's

press release issued the same day, Ward stated that "[t]his transaction completes another step in our plan to raise the capital needed to accelerate and maximize the value of our assets." That same day, SandRidge also issued the Company's financial results for the second quarter of 2011. The Company's press release emphasized the purported successful transformation that SandRidge performed into an oil-producing company and the monetization of SandRidge's Mississippian formation assets. Within the press release, Ward also touted the Company's increased focus upon oil production. Additionally, the Company's April 4, 2011 press release stated that the Company "is introducing certain guidance for 2012. The company expects to incur approximately $1.8 billion in capital expenditures and produce approximately 29.1 MMBoe."

62.     On September 27, 2011, SandRidge issued a press release entitled "SandRidge Energy, Inc. Signs Agreement to Sell Certain East Texas Properties for $231 Million and Announces Revised Production Guidance." Within the press release, the Company claimed that the sale of certain East Texas Properties was part of the Company's plan to double oil production.

63.     On November 3, 2011, SandRidge announced the Company's financial results for the third quarter of 2011 and revised SandRidge's guidance for 2011 and 2012. Although the Company's claimed to revise guidance based upon operational difficulties in the Permian Basin, SandRidge stated that its Mississippian formation assets were performing solidly.

64.    On December 22, 2011, SandRidge issued a press release entitled "SandRidge Energy, Inc. Announces $1 Billion Mississippian Joint Venture."  Within the press release, the Company stated that "[u]nder the agreement, SandRidge will sell an approximate 25% non-operated working interest, or 250,000 net acres, in the Extension Mississippian play located in Western Kansas and an approximate 16% non-operated working interest, or 113,636 net acres, in its Original Mississippian play."  CEO Ward, moreover, represented that "[w]e compare the scope of this play to the Bakken and believe it will be transformational for the Mid-Continent region of the United States."  Ward also stated that the "JV with Respol puts us on a clear path to bridge the 2012 funding gap with non-debt capital and to execute our three year plan to triple EBITDA and double oil production while lowering our debt to EBITDA ratio."

65.    On January 5, 2012, SandRidge issued a press release announcing the filing of a registration statement with the SEC concerning to the IPO of approximately $500 million in common units.  The units represented beneficial interests in SandRidge Mississippian Trust II, which was a newly formed Delaware trust.  Pursuant to the registration statement, the underwriters would have an option to purchase up to approximately $75 million in additional common units within 30 days of closing to cover over allotments.  The Company's Mississippian Trust II would be listed on the NYSE under the symbol "SDR."

66.    On January 5, 2012, SandRidge also issued a press release related to the Company's registration statement concerning the Mississippian Trust II IPO.  Within the

press release, SandRidge stated that in connection with the SandRidge Mississippian Trust II IPO, SandRidge would convey to the trust certain royalty interests in exchange for the net proceeds from the offering and units representing approximately 48% of the beneficial interest in the trust.   These royalty interests would entitle the SandRidge Mississippian Trust II to a percentage of the proceeds received by SandRidge from the production of hydrocarbons from currently producing wells and development wells to be drilled by SandRidge on approximately 53,000 net acres in the Mississippian formation in northern Oklahoma and Kansas.

67.    On February 1, 2012, SandRidge issued a press release announcing the planned acquisition of Dynamic Offshore.   Within the press release, SandRidge also announced the Company's operations results for 2011 and the Company's year-end reserve summary.   With respect the Dynamic Offshore acquisition, SandRidge stated that "[t]hese oil rich assets will add reserves, production and cash flow at an attractive valuation that is consistent with the achievement of SandRidge's three year plan to triple EBITDA and double oil production while lowering its debt to EBITDA ratio."   SandRidge also represented that "[a]pproximately 50% of Dynamic's current production and proved reserves consists of oil.   The acquisition will be accretive to SandRidge's earnings and cash flow per share as well as improve its leverage metrics."   Additionally, CEO Ward stated that "[t]he value of this acquisition will be evident immediately in our results.   We are acquiring these assets for less than PV-10 of the proved developed reserves and at just over $50,000 per flowing barrel.   Additionally, we expect these

operations to contribute significant free cash flow in excess of the anticipated annual drilling and recompletion capital budget of $200 million."   With respect to the Company's year-end operational results for 2011, SandRidge announced: (1) increased total proved reserves; (2) increased oil reserves; (3) reserve replacement of 302%; (4) increase PV-10 (Non-GAAP) total proved reserves; and (5) a 60% growth in oil production.   With respect to the Company's year-end 2011 reserve summary, the Company announced that "SandRidge increased year-end 2011 proved reserves to 471 MMboe, 11% higher than 2010 proved reserves . . . .The Horizontal Mississippian play and the Central Basin Platform contributed reserve growth of 101 MMboe . . . . Essentially all of SandRidge's 2011 reserve additions were the result of the company's drilling program."   SandRidge also announced that "[t]he company's 2011 proved reserves had a PV-10 of $6.9 billion, a 52% increase from 2010."   The "Analysis of Proved Reserves and Replacement Economics" provided in the Company's February 1, 2012 press release also stated that the "% Oil Properties to Total PV-10" had increased to 96% in 2011 from 88% in 2010.

68.   On February 23, 2012, SandRidge announced the Company's financial results for the fourth quarter of 2011 and for the year ended 2011.  SandRidge also issued a press release on the same day that updated the Company's 2012 guidance concerning the Dynamic Offshore acquisition.  Specifically, SandRidge represented that the Dynamic Offshore acquisition: (1) increased production by approximately 5.8 MMBoe; (2) decreased oil and natural gas differentials as production from the Dynamic properties was

expected to realize higher prices; (3) decreased per unit DD&A – other, G&A – cash, G&A – stock and interest expense due to increased production; and (4) increased EBITDA from Oilfield Services, Midstream and Other for revenues from production handling agreements associated with the Dynamic properties.

69.    On April 2, 2012, SandRidge announced that the Company planned to conduct a private offering of $750 million of Senior Notes due 2022. SandRidge intended to use the net proceeds from the offering to finance the cash consideration of approximately $680 million payable in connection with the Company's acquisition of Dynamic Offshore and to pay associated costs and expenses.

70.    On April 9, 2012, SandRidge announced that it had commenced the IPO of 26 million common units of SandRidge Mississippian Trust II, representing a 52% beneficial interest in the trust, along with 3.9 million additional common units that could be purchased at the option of the underwriters to cover over-allotments. The Company also stated that upon completion of the SandRidge Mississippian Trust II IPO, SandRidge would own approximately 11.3 million common units as sponsor of the trust. SandRidge also announced that the SandRidge Mississippian Trust II would own royalty interests conveyed by SandRidge that would entitle the trust "to a percentage of the proceeds received by SandRidge from the production of hydrocarbons from currently producing wells and development wells to be drilled by SandRidge on approximately 53,000 net acres in the Mississippian formation in northern Oklahoma and southern Kansas."

71.     In an April 20, 2012 interview with *SeekingAlpha.com*, CEO Ward represented that SandRidge stated that "we hedged all of our natural gas production for two years, while we made a conversion to oil."  Ward also claimed that "[t]he important things to understand is that we have a three-year strategy that no other company in the U.S. has; and that's that we're going to triple EBITDA, we're going to double our oil production, and we are going to increase production."  Ward also stated that "by the end of 2014, we'll be doing it all within our cash flow.  And all the while, we'll be improving our credit metrics."

72.     On April 17, 2012, SandRidge announced that the SandRidge Mississippian Trust II priced 26 million common units at $21.   The 26 million common units represented a 52% beneficial interest in the trust and the underwriters had 30 days to exercise an option to purchase an additional 3.9 million common units from the trust to cover over-allotments.  Following completion of the SandRidge Mississippian Trust II IPO, SandRidge would own approximately 11.3 million common units, approximately 12.4 million subordinated units convertible into common units, and the trust would have a total of 49.725 million trust units outstanding.

73.     On April 23, 2012, SandRidge announced that the Company had closed its IPO of 29.9 million common units of SandRidge Mississippian Trust II, including 3.9 million common units sold pursuant to the exercise of the underwriters' over-allotment option, representing a 60% beneficial interest in the trust.  As sponsor of the trust, SandRidge retained approximately 7.4 million common units and approximately 12.4

million subordinated units convertible into common units.  Before the underwriting discount, gross proceeds of the transaction were approximately $628 million, and SandRidge received approximately $590 million as partial consideration for the conveyance of the royalty interests held by the trust.

74.     On May 3, 2012, SandRidge announced its financial results for the first quarter of 2012.  In the Company's press release issued the same day, SandRidge touted that: (1) Mississippian daily average production grew by 23% quarter over quarter; (2) SandRidge experienced record oil production in the first quarter of 2012; (3) the Company experienced recent peak production of 99 MBoe per day on April 29, 2012; and (4) SandRidge raised $590 million in net proceeds from the IPO of SandRidge Mississippian Trust II in April 2012.

75.     On August 2, 2012, SandRidge announced its financial results for the second quarter of 2012.  Within the Company's press release issued the same day, SandRidge represented that Mississippian daily average production grew 31% quarter over quarter and 199% from the comparable period in 2011.  SandRidge also stated that the Company completed its IPO of SandRidge's Mississippian Trust II and sold units of SandRidge Mississippian Trust I, raising $615 million in total net proceeds.  Within the August 2, 2012 press release, SandRidge also increased 2012 production guidance, increased 2012 capital expenditure guidance, and decreased the 2012 mid-point lifting cost guidance.

76.    On August 6, 2012, SandRidge announced that the Company had priced a private placement of $1.1 billion of Senior Notes, comprised of $825 million of 7.5% Senior Notes due 2023 and $275 million of 7.5% Senior Notes due 2021.  The Company also announced that net proceeds from the offering would be used to fund the Company's pending tender offer for up to $350 million in aggregate principal amount of its Senior Floating Rate Notes due 2014 and other corporate purposes.

77.    On November 8, 2012, Dnakar Singh – the CEO of TPG-Axon ("TPG"), which then owned 4.5% of SandRidge's stock – issued a letter to the Company's Board calling for the resignation of CEO Ward.   TPG cited the Company's disastrous performance and over 76% decline in its stock price since its IPO in 2007.  TPG stated that Ward was an insatiable spender with an incoherent strategy.  TPG also referenced the Company's payment of $150 million in compensation to Ward over the prior five years, including total compensation in 2011 of $25 million, representing half of the Company's earnings.  TPG also claimed that despite the Company's poor performance, that when Ward's compensation is adjusted for market capitalization, Ward was the single highest compensated CEO among all energy companies, and among the highest compensated CEOs in the United States.

78.    The TPG letter also described the Company's Executive Well Participation Plan that further exemplified Ward's self-dealing.   According to the letter, although SandRidge eliminated the Company's Executive Well Participation plan, the Company did so immediately after the market collapse in October 2008 *by paying over $67 million*

*to Ward*.  Additionally, the wells that the Company re-purchased from Ward were natural gas wells even as the Company was publicly proclaiming the need to abandon their natural gas focus and shift toward oil exploration and development.  The result of the Company's action was to enrich the Company's management at the expense of shareholders.  The letter, moreover, explained that Ward has used his excessive compensation to purchase large holdings of ranchland, which Ward, in turn, has leased to the Company for future exploration.  Ward, furthermore, purchased a significant interest in the Oklahoma City Thunder basketball team only to have SandRidge pay him and other owners millions per year in sponsorship and luxury suite payments.  Indeed, SandRidge is one of the largest corporate supporters of the Oklahoma City Thunder and the company that owns it.

79.    On November 8, 2012 – after the close of trading – SandRidge also issued a press release announcing the Company's financial results for the third quarter of 2012.  The Company reported a loss of $184 million, or 39 cents per share, compared with a profit of $561 million, or $1.16 per share, in the third quarter of 2011.  During the subsequent conference call with investors, CEO Ward admitted that SandRidge had been overstating the value of its Mississippian assets throughout the Relevant Period.  CEO acknowledged that the Company's Mississippian formation assets consisted of far more low-margin natural gas deposits and far fewer high-margin oil deposits than the Individual Defendants led the market to believe.  CEO Ward conceded that "[a]s we continue to grow the Mississippian well count across a larger area, we also are seeing an

increase in our natural gas production.  And this increase has been offset by a lower amount of oil than we anticipated at the beginning of last year."  Ward also acknowledged that the Mississippian formation assets would produce only 40% oil going forward, rather than 45% as the Individual Defendants had been using in their projections throughout the Relevant Period, with the rest of production comprised of lower margin natural gas.

80.    The Company's November 8, 2012 press release also revealed that SandRidge intended to sell off the remaining interest in the Company's high margin, oil-producing Permian Basin assets.  The Company stated that the Permian asserts were the more assets that could command a higher market price.  SandRidge conceded that it intended to go from 52% of high-margin oil recovery "to about 40%."

81.    The Company also revealed during its November 9, 2012 earnings call that during the second quarter of 2012, the Company experienced mechanical issues with one of the three rigs that the Company needed to drill in the new Gulf of Mexico assets acquired in the Dynamic Offshore acquisition.  These mechanical issues rendered the rig inoperable and required SandRidge to ramp down drilling in the Gulf of Mexico.

82.    Analysts and the market were shocked by the Company's revelations.  On this news, SandRidge's stock price plummeted from its November 8, 2012 closing price of $6.10 per share to close at $5.51 per share on November 9, 2012 – a decline of 9% on extremely high volume.  The true facts regarding the Company's financial condition and operations – of which the Individual Defendants were aware or recklessly disregarded –

included the following: (1) SandRidge actually acquired significant additional natural gas producing assert from Ward through the Company's termination of the Executive Well Participation Plan, which, contrary to the Individual Defendants' representations, increased SandRidge's focus on natural gas production; (2) the Company was overstating the value of SandRidge's Mississippian formation assets throughout the Relevant Period; (3) the Company experienced mechanical issues with one of the three rigs that the Company needed to drill in the new Gulf of Mexico assets acquired in the Dynamic Offshore acquisition that rendered the rig inoperable and required SandRidge to ramp down drilling in the Gulf of Mexico; (4) the Individual Defendants intended the $1.3 billion Dynamic Offshore acquisition to be utilized as a mere financing vehicle for the Company's onshore drilling projects despite the Company's representations that the Company did not need to further dilute shareholder interest in SandRidge through equity offerings; and (5) the Individual Defendants were aware of facts that seriously undermined the accuracy of the guidance of SandRidge's earnings guidance for 2012.

## DERIVATIVE AND DEMAND EXCUSED ALLEGATIONS

83.      Plaintiff brings this action derivatively in the right, and for the benefit, of the Company to redress injuries suffered, and to be suffered, by the Company as a direct result of the breaches of fiduciary duty, abuse of control, gross mismanagement, waste of corporate assets and unjust enrichment, as well as the aiding and abetting thereof, by the Individual Defendants.   The Company is named as a nominal defendant solely in a

derivative capacity.  This is not a collusive action to confer jurisdiction in this Court that it would not otherwise have.

84.     Plaintiff will adequately and fairly represent the interests of the Company and its shareholders in enforcing and prosecuting its rights.

85.     Plaintiff is the owner of the Company's common stock and was the owner of the Company's common stock at all times relevant to the Individual Defendants' wrongful course of conduct alleged herein.

86.     At the time that this action was commenced, the Company's Board consisted of the following directors: Defendants Ward, Brewer, Dobson, Gilliland, Jordan, Oliver, and Serota.

87.     As a result of the facts set forth herein, plaintiff has not made any demand on the Company's Board to institute this action against the Individual Defendants.  Such demand would be a futile and useless act with respect to each and every one of the Individual Defendants because they are incapable of making an independent and disinterested decision to institute and vigorously prosecute this action for the following reasons:

a.     Defendant Ward lacks both the independence and disinterestedness required to impartially consider a demand by Plaintiff. Ward has received substantial monetary compensation and other benefits from the Company – totaling over $150 million during the Relevant Period – and cannot be considered independent;

b.      Ward dominates the SandRidge Board, as evidenced by the fact that he is the sole founder of SandRidge who, prior to the fourth quarter of 2007, when a Nominating and Governance Committee was established, handpicked Directors: (1) Individual Directors Gilliland, Jordan, Oliver, and Serota have been hand selected by Defendant Ward and are loyal to him, such that they would not exercise independence; (2) Defendant Ward could not comply with the fiduciary duties to independently consider a pre-suit demand to bring the claims alleged herein because he is employed by SandRidge as its Chairman of the Board and CEO.  Defendant Ward's employment with SandRidge makes him independence-impaired because he is beholden to, and financially dependent on, SandRidge. Moreover, as alleged herein, Ward is directly implicated in the improper and illegal acts giving rise to this complaint. Therefore, Ward would not be able to vigorously prosecute any such action and cannot, in good faith, exercise independent business judgment to determine whether to bring this action against himself;

c.      Defendant Dobson also lacks both the independence and disinterestedness required to impartially consider a demand by Plaintiff because he is directly tied to Defendant Ward as a co-owner of the Thunder basketball team and thus directly implicated in the actions complained of herein. Defendants Dobson and Ward (along with the CEO of Chesapeake Energy Corp.) serve on the Board of Directors for the Thunder.  Therefore, Dobson would not be able to vigorously prosecute any such action and cannot, in good faith, exercise independent business judgment to determine whether to bring this action against himself;

42

d.    Defendant   Gilliland   lacks   both   the   independence   and disinterestedness required to impartially consider a demand by plaintiff because he has engaged in numerous transactions with the Company, including assisting it in acquisitions and himself acquiring interests in related companies and selling an office building to the Company.  Moreover, because Gilliland was hand-selected to serve on the Board by Ward, he is loyal and beholden to him, such that he would not exercise independence.  Gilliland was also a member of the Compensation Committee during the Relevant Period when it recommended to the Board the outsized compensation awards to Ward and the other executives.  Thus, Gilliland would not be able to vigorously prosecute any such action and cannot, in good faith, exercise independent business judgment to determine whether to bring this action against himself;

e.    Defendant Jordan lacks both the independence and disinterestedness required to impartially consider a demand by Plaintiff because he is a former employee of SandRidge, having been its Vice President. Additionally, Defendant Jordan has engaged in numerous transactions with SandRidge, including selling his interest in 2006 in a company to SandRidge for $5.49 million and, in July 2006, selling his interests in oil and gas properties to the Company for $9 million.  Defendant Jordan also participated in the well participation program described herein for several years.   Accordingly, these transactions with SandRidge make him independence-impaired because he is beholden to, and financially dependent on, SandRidge.   Moreover, because Jordan was hand selected to serve on the Board by Ward, he is loyal and beholden to him, such that he

43

would not exercise independence.   Jordan was also a member of the Compensation Committee during the Relevant Period when it recommended to the Board the outsized compensation awards to Ward and the other executives.   Jordan was also a member of the Nominating and Corporate Governance Committee and thus was aware of the breaches of duties and the Code of Business Conduct and Ethics alleged herein.   Furthermore, as alleged herein, Jordan is directly implicated in the improper and illegal acts giving rise to this complaint.   Therefore, Jordan would not be able to vigorously prosecute any such action and cannot, in good faith, exercise independent business judgment to determine whether to bring this action against himself;

       f.    Defendant Oliver lacks both the independence and disinterestedness required to impartially consider a demand by Plaintiff because he is directly tied to the Company. In September 2006, the Company entered into a facilities lease with an entity of which Oliver is the majority owner.   In 2008 alone, rent expenses for the lease were $1.4 million.   Defendant Oliver's lease with SandRidge makes him independence-impaired because he is beholden to, and financially dependent on, SandRidge.   Moreover, because Oliver was hand-selected to serve on the Board by Ward, he is loyal and beholden to him, such that he would not exercise independence. Oliver was also a member of the Compensation Committee during the Relevant Period when it recommended to the Board the outsized compensation awards to Ward and the other executives.   Oliver was also a member of the Nominating and Corporate Governance Committee and thus was aware of the breaches of duties and the Code of Business

44

Conduct and Ethics alleged herein. Thus, Oliver would not be able to vigorously prosecute any such action and cannot, in good faith, exercise independent business judgment to determine whether to bring this action against himself;

g.      Defendant Serota lacks both the independence and disinterestedness required to impartially consider a demand by Plaintiff because he has engaged in numerous transactions with the Company, including assisting it in acquisitions and himself acquiring interests in related companies and selling an office building to the Company.  Defendant Serota is also the senior partner in a private equity group named Ares Management LLC ("Ares") which, during the Relevant Period, has owned close to 10% of the Company and well over ten million shares of common stock.  Moreover, because Serota was hand-selected to serve on the Board by Ward, he is loyal and beholden to him, such that he would not exercise independence. Therefore, Serota would not be able to vigorously prosecute any such action and cannot, in good faith, exercise independent business judgment to determine whether to bring this action against himself;

h.      The Individual Defendants have served on committees during the Relevant Period. In particular, Defendants Brewer, Gilliland, Jordan, and Oliver have served on the Compensation Committee, charged with reviewing, evaluating, and approving plans, policies, and programs for compensation of Company officers, including Ward. Indeed, the Compensation Committee (including Defendants Brewer, Gilliland, Jordan, and Oliver) actually set the egregious compensation of Ward complained of herein. They are thus directly implicated in the improper and illegal acts

45

giving rise to this complaint. Therefore, they would not be able to vigorously prosecute any such action and cannot, in good faith, exercise independent business judgment to determine whether to bring this action against themselves;

i.       Defendants themselves have received significant income from the Company, thus making demand upon them futile. In the most recent filing listing director compensation (dated April 26, 2012), the Individual Defendants earned between $297,000 and $375,000/year, and as high as $400,000/year the previous year. The Board is therefore one of the top twenty companies in the nation for director compensation.  The Individual Defendants have received substantial monetary compensation and other benefits from the Company and cannot be considered independent; Defendants are exposed to substantial potential liability in this action because of their complete failure to put in place or enforce appropriate controls necessary to assure that all actions were in the best interest of the Company and its shareholders as opposed to those of executives. Members of the Board necessarily had knowledge of the wrongdoing and did nothing to prevent it, to stop it, or to prosecute this action;

j.       Defendants face a substantial likelihood of being held liable for breaching their fiduciary duties of loyalty and good faith as alleged herein, and are therefore incapable of disinterestedly and independently considering a demand to commence and vigorously prosecute this action;

k.       The entire Board and senior management participated in the wrongs complained of herein.  For the reasons described herein, the Company's directors are not

46

disinterested or independent.  Pursuant to their specific duties as Board members, each was charged with the management of the Company and the conduct of its business affairs.  Each of the above referenced defendants breached the fiduciary duties they owed to the Company and its shareholders in that they failed to prevent and correct the dissemination of the Company's false and misleading statements.  Thus, the Board cannot exercise independent objective judgment in deciding whether to bring this action or whether to vigorously prosecute this action because its members are interested personally in the outcome since their actions have subjected the Company to millions of dollars in potential liability for violations of applicable securities laws;

l.     Defendant Ward certified certain of the Company's SEC filings. Accordingly, demand is futile because of the substantial likelihood of liability for breach of fiduciary duties owed to the Company through the certification of the Company's SEC filings;

m.     Each of the key officers and directors knew of and/or directly benefited from the wrongdoing complained of herein thereby rendering demand futile;

n.     The Individual Defendants approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the Company's stockholders or recklessly and/or negligently disregarded the wrongs complained of herein, and are therefore not disinterested parties;

o.      In order to bring this suit, all of the Company's directors would be forced to sue themselves and persons with whom they have extensive business and personal entanglements, which they will not do, thereby excusing demand;

p.      The acts complained of constitute violations of the fiduciary duties owed by the Company's officers and directors and these acts are incapable of ratification;

q.      Each of the Individual Defendants authorized and/or permitted the false statements disseminated directly to the public and which were made available and distributed to shareholders, authorized and/or permitted the issuance of various of the false and misleading statements, and are principal beneficiaries of the wrongdoing alleged herein, and thus could not fairly and fully prosecute such a suit even if they instituted it;

r.      Any suit by the Company's current directors to remedy these wrongs would likely expose the Individual Defendants and the Company to further violations of the securities laws that would result in civil actions being filed against one or more of the Individual Defendants; thus, the Individual Defendants are hopelessly conflicted in making any supposedly independent determination whether to sue themselves;

s.      The Company has been, and will continue to be, exposed to significant losses due to the wrongdoing complained of herein, yet the Individual Defendants have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for the Company any part of the damages that the Company suffered and will suffer thereby; and

48

o.      If the current directors were to bring this derivative action against themselves, they would thereby expose their own misconduct, which underlies allegations against them contained in a class action complaint for violations of securities law, which admissions would impair their defense of the class action and greatly increase the probability of their personal liability in the class action, in an amount likely to be in excess of any insurance coverage available to the Individual Defendants.   Thus, the Individual Defendants would be forced to take positions contrary to the defenses they will likely assert in the securities class action.

88.      Moreover, despite the Individual Defendants having knowledge of the claims and causes of action raised by plaintiff, the current Board has failed and refused to seek to recover for the Company for any of the wrongdoing alleged by plaintiff herein.

89.      Plaintiff, moreover, has not made any demand on shareholders of the Company to institute this action since demand would be a futile and useless act for the following reasons:

a.      The Company is a publicly held, with over 490 million shares outstanding and thousands of shareholders;

b.      Making demand on such a number of shareholders would be impossible for plaintiff who has no way of determining the names, addresses, or phone numbers of shareholders; and

c.      Making demand on all shareholders would force plaintiff to incur huge expenses, assuming all shareholders could be individually identified.

49

90.     Furthermore, the conduct alleged herein could not have been the product of good faith business judgment, and each of the Individual Defendants faces a substantial likelihood of liability for breaching their fiduciary duties because, through their intentional misconduct, they have subjected the Company to substantial damages. Furthermore, the conduct of the Individual Defendants has subjected the Company to potential liability in connection with a securities fraud class actions entitled *Carbone v. SandRidge Energy, Inc*., et al., Case No. Civ-13-19-HE, currently pending in the United States District Court for the Western District of Oklahoma.   Through their intentional misconduct, the Individual Defendants have subjected the Company to potential costs, fines, and judgments associated with the securities class action.   Such actions by the Individual Defendants cannot be protected by the business judgment rule.   Accordingly, making a pre-suit demand on the Individual Defendants would be futile.

## COUNT I
## (AGAINST THE INDIVIDUAL DEFENDANTS FOR BREACH OF FIDUCIARY DUTY FOR DISSEMINATING FALSE AND MISLEADING INFORMATION)

91.     Plaintiff incorporates by reference each of the preceding paragraphs as though they were set forth in full herein.

92.     The Individual Defendants – and particularly the Individual Defendants that served as members of the Company's Audit Committee – owed a fiduciary duty to the Company to supervise the issuance of the Company's press releases and public filings to ensure that they were truthful and accurate and that such filings conformed to applicable

securities laws.  The Individual Defendants, however, breached their fiduciary duties by allowing the Company to issue and disseminate misleading statements and filings.

93.   As members of the Board, the Individual Defendants were directly responsible for authorizing, permitting the authorization of, or failing to monitor the practices that resulted in violations of applicable laws as alleged herein.  Each of the Individual Defendants had knowledge of, actively participated in, approved, and/or acquiesced in the wrongdoing alleged herein or abdicated his or her responsibilities with respect to this wrongdoing.  The alleged acts of wrongdoing have subjected the Company to unreasonable risks of losses and expenses.

94.   Each of the Individual Defendants' acts in causing or permitting the Company to disseminate material misrepresentations and omissions to the investing have subjected the Company to liability for violations of applicable laws, and therefore were not the product of a valid exercise of business judgment, constituting a complete abdication of their duties as officers and/or directors of the Company.  As a result of the Individual Defendants' breaches, the Company's reputation in the business community and financial markets has been irreparably tarnished.

**COUNT II**
**(AGAINST THE INDIVIDUAL DEFENDANTS FOR BREACH OF FIDUCIARY DUTY FOR FAILING TO PROPERLY OVERSEE AND MANAGE THE COMPANY)**

95.   Plaintiff incorporates by reference each of the preceding paragraphs as though they were set forth in full herein.

51

96.     The Individual Defendants owed the Company fiduciary obligations.  By reason of such fiduciary obligations, the Individual Defendants specifically owed the Company the highest obligation of good faith, fair dealing, loyalty, and due care, reasonable inquiry, oversight, and supervision.

97.      The Individual Defendants violated and breached their fiduciary duties of good faith, fair dealing, loyalty, due care, reasonable inquiry, oversight, and supervision by engaging in a sustained and systematic failure to exercise their oversight responsibilities and to ensure that the Company complied with applicable laws, rules, and regulations.  As a direct and proximate result of the Individual Defendants' failure to adequately perform their fiduciary obligations, the Company has sustained significant damages monetarily and injury to its corporate image and goodwill.

98.     As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.  Plaintiff, moreover, has no adequate remedy at law.

## COUNT III
## (AGAINST THE INDIVIDUAL DEFENDANTS FOR GROSS MISMANGEMENT)

99.     Plaintiff incorporates by reference each of the preceding paragraphs as though they were set forth in full herein.

100.    The Individual Defendants had a duty to the Company and its shareholders to prudently supervise, manage, and control the operations, business, and internal financial accounting and disclosures of the Company.   The Individual Defendants, however, by their actions, and by engaging in the wrongdoing alleged herein, abandoned

and abdicated their responsibilities and duties with regard to prudently managing the business of the Company in a manner consistent with the duties imposed upon them by law.  By committing the misconduct alleged herein, the Individual Defendants breached their duties of due care, diligence, and candor in the management and administration of the Company's affairs and in the use and preservation of the Company's assets.

101.   During the course of the discharge of their duties, the Individual Defendants were aware of the unreasonable risks and losses associated with their misconduct.  Nevertheless, the Individual Defendants caused the Company to engage in the scheme described herein which they knew had an unreasonable risk of damage to the Company, thus breaching their duties to the Company.   As a result, the Individual Defendants grossly mismanaged the Company, thereby causing damage to the Company.

**COUNT IV**
**(AGAINST THE INDIVIDUAL DEFENDANTS FOR CONTRIBUTION AND INDEMIFICATION)**

102.   Plaintiff incorporates by reference each of the preceding paragraphs as though they were set forth in full herein.

103.   The Company is alleged to be liable to various persons, entities and/or classes by virtue of the facts alleged herein that give rise to defendants' liability to the Company.

104.   The Company's alleged liability on account of the wrongful acts, practices, and related misconduct alleged arises, in whole or in part, from the knowing, reckless, disloyal and/or bad faith acts or omissions of the Individual Defendants, and the

Company is entitled to contribution and indemnification from each Individual Defendant in connection with all such claims that have been, are, or may in the future be asserted against the Company by virtue of the Individual Defendants' misconduct.

## COUNT V
## (AGAINST THE INDIVIDUAL DEFENDANTS FOR ABUSE OF CONTROL)

105.   Plaintiff incorporates by reference each of the preceding paragraphs as though they were set forth in full herein.

106.   The Individual Defendants' conduct, as alleged herein, constituted an abuse of their control over the Company.

107.   As a direct and proximate result of the Individual Defendants' abuse of control, the Company has suffered, and will continue to suffer, damages for which the Individual Defendants are liable.  Plaintiff, moreover, has no adequate remedy at law.

## COUNT VI
## (AGAINST THE INDIVIDUAL DEFENDANTS FOR
## WASTE OF CORPORATE ASSETS)

108.   Plaintiff incorporates by reference each of the preceding paragraphs as though they were set forth in full herein.

109.   The Individual Defendants' conduct, as alleged herein, constituted a waste of the corporate assets of the Company.

110.   As a direct and proximate result of the Individual Defendants' abuse of control, the Company has suffered, and will continue to suffer, damages for which the Individual Defendants are liable.  Plaintiff, moreover, has no adequate remedy at law.

## COUNT VII
## (AGAINST THE INDIVIDUAL DEFENDANTS FOR
## VIOLATIONS OF SECTION 14(a) OF THE EXCHANGE ACT)

111.   Plaintiff incorporates by reference each of the preceding paragraphs as though they were set forth in full herein.  For purposes of this count, plaintiff expressly disclaims any allegations of fraud.  This count, therefore, does not sound in fraud and is based upon the negligent conduct by the Individual Defendants named herein.

112.   Rule 14a-9, promulgated pursuant to §14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14a-9.

113.   In the Company's Proxy Statements filed on Form DEF 14A with the SEC and disseminated to SAIC stockholders including, but not limited to, on January 18, 2013, April 15, 2012, (collectively, the "Proxies"), the Board issued materially false and misleading statements.  For instance, in the Company's proxy statement filed on January 18, 2013, SandRidge falsely represented the following:

> In response to the sharp decline in gas prices in 2008 and the persistently depressed prices for natural gas, your Board and management team have been singularly focused on transforming the Company into an oil-focused producer while growing the Company's asset base and improving its financial position. Over the past several years, we have built a strong platform to drive future performance and stockholder value. This includes:
>
> • Successfully repositioning SandRidge from a company with 76% of revenues attributable to natural gas in 2008 to a company with 86% of its revenues coming from oil today

• Becoming the industry leader in one of the most valuable basins in the U.S. – the Mississippian Lime play – where our production has grown over 18x from the third quarter of 2010 to the third quarter of 2012 based on our ability to leverage our operational expertise and experience across our high quality, high return assets

114.    Similarly, with the Company's proxy statement filed on April 25, 2012,

SandRidge stated the following:

Under its current organizational structure, the Company has acted quickly and decisively on numerous occasions to seek Board approval and facilitate the successful completion of strategic acquisitions of oil and natural gas properties, including the recent acquisition of Dynamic Offshore Resources, LLC, transactions involving acquisitions and dispositions of other assets, and joint venture, royalty trust and other significant capital-raising transactions during changing and unpredictable market conditions. The Board believes these outstanding results were facilitated, in large part, by Mr. Ward's ability to serve as an effective bridge between the Board and management, providing the Board with a thorough understanding of the Company and its business and fostering an open dialogue between the Board and senior management. In addition, the Board believes that by holding both of these roles, Mr. Ward has been able to give the Company united leadership for executing strategic initiatives and meeting challenges.

* * *

Our compensation program has remained competitive despite a fluctuating stock price over the last couple of years, primarily because the reasons for such fluctuation, we believe, were mainly due to commodity price fluctuation, uncertainty in global equity markets and delayed acceptance by the market of the Company's transition from natural gas to oil. Providing competitive compensation to our executive team was particularly important during 2011, as the Company continued to execute its plan to move from being primarily a natural gas producer to one that produces primarily oil. In 2011, oil production comprised 80% of the Company's production revenues with only 20% attributable to natural gas (compared to 64% oil and 36% natural gas in 2010 and 35% oil and 65% natural gas in 2009). Since 2009, the price of oil has increased from below $50 per Bbl to above $100 per Bbl while the price of natural gas declined from over $6.00 MMBtu to less than $2.40 MMBtu, consistent with the expectations of Company management in late 2008 when it developed the strategy to shift to oil. Providing competitive compensation in 2012 and future years will be key to

the Company's ability to implement the next phase of its strategic plan to increase EBITDA and oil production while at the same time reducing its leverage.

115.   Defendants' statements in the Proxies were false and misleading because, as alleged more fully above, (1) SandRidge actually acquired significant additional natural gas producing assert from Ward through the Company's termination of the Executive Well Participation Plan, which, contrary to the Individual Defendants' representations, increased SandRidge's focus on natural gas production; and (2) the Company was overstating the value of SandRidge's Mississippian formation assets throughout the Relevant Period.

116.   In the exercise of reasonable care, the Individual Defendants should have known that the statements contained in the Proxies were materially false and misleading.

117.   The misrepresentations and omissions in the Proxies were material to plaintiff.  The Proxies were an essential link in the accomplishment of the continuation of the wrongdoing alleged herein.

118.   The Company was damaged as a result of the Individual Defendants' material misrepresentations in the Proxies.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment as follows:

A.   Against all of the Individual Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties;

B.      Awarding to plaintiff the costs and disbursements of the action, including

reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

C.      Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.


DATED:  January 22, 2013                    /s/ William B. Federman
                                            FEDERMAN & SHERWOOD
                                            WILLIAM B. FEDERMAN (OK Bar No.
                                            2853)
                                            10205 North Pennsylvania
                                            Oklahoma City, Oklahoma 73120
                                            Telephone: (405) 235-1560
                                            Facsimile: (405) 239-2112
                                            wbf@federmanlaw.com

                                            *Local Attorneys for Plaintiff*

                                            GLANCY BINKOW & GOLDBERG LLP
                                            LIONEL Z. GLANCY
                                            MICHAEL M. GOLDBERG
                                            EX KANO S. SAMS II
                                            1925 Century Park East, Suite 2100
                                            Los Angeles, California 90067
                                            Telephone: (310) 201-9150
                                            Facsimile: (310) 201-9160

                                            WILLIE C. BRISCOE
                                            THE BRISCOE LAW FIRM, PLLC
                                            8150 North Central Expressway
                                            Suite 1575
                                            Dallas, Texas 75206
                                            Telephone: (214) 239-4568
                                            Facsimile: (281) 254-7789

                                            POWERS TAYLOR
                                            PATRICK POWERS
                                            MARK TAYLOR
                                            PEYTON HEALEY
                                            Campbell Centre II
                                            8150 North Central Expy.,
                                            Suite 1575
                                            Dallas, Texas 75206
58

Telephone: (214) 239-8900
Facsimile: (214) 239-8901

*Counsel for Plaintiff*

## VERIFICATION

I, Deborah Depuy, hereby declare as follows:

I am the plaintiff in the within entitled action.   I have read the Verified Shareholder Derivative Complaint.   Based upon discussions with and reliance upon my counsel, and as to those facts of which I have personal knowledge, the Complaint is true and correct to the best of my knowledge, information, and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Signed and Accepted:

Dated: _January 17, 2013_

_Deborah Depuy_

**DEBORAH DEPUY**

1